(Slip Opinion)          OCTOBER TERM, 2007          1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## DAVIS *v.* FEDERAL ELECTION COMMISSION

### APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

No. 07–320.  Argued April 22, 2008—Decided June 26, 2008

Federal-law limits on the amount of contributions a House of Representatives candidate and his authorized committee may receive from an individual, and the amount his party may devote to coordinated campaign expenditures, 2 U. S. C. §§441a(a)(1)(A), (a)(3)(A), (c), and (d), normally apply equally to all competitors for a seat and their authorized committees.  However, §319(a) of the Bipartisan Campaign Reform Act of 2002 (BCRA), 2 U. S. C. §441a–1(a), part of the so-called "Millionaire's Amendment," fundamentally alters this scheme when, as a result of a candidate's expenditure of personal funds, the "opposition personal funds amount" (OPFA) exceeds $350,000.  The OPFA is a statistic comparing competing candidates' personal expenditures and taking account of certain other fundraising.  When a "self-financing" candidate's personal expenditure causes the OPFA to pass $350,000, a new, asymmetrical regulatory scheme comes into play. The self-financing candidate remains subject to the normal limitations, but his opponent, the "non-self-financing" candidate, may receive individual contributions at treble the normal limit from individuals who have reached the normal limit on aggregate contributions, and may accept coordinated party expenditures without limit.  See §§441a–1(a)(1)(A)–(C).  Because calculating the OPFA requires certain information about the self-financing candidate's campaign assets and personal expenditures, §319(b) requires him to file an initial "declaration of intent" revealing the amount of personal funds the candidate intends to spend in excess of $350,000, and to make additional disclosures to the other candidates, their national parties, and the Federal Election Commission (FEC) as his personal expenditures exceed certain benchmarks.

   Appellant Davis, a candidate for a House seat in 2004 and 2006

who lost both times to the incumbent, notified the FEC for the 2006 election, in compliance with §319(b), that he intended to spend $1 million in personal funds. After the FEC informed him it had reason to believe he had violated §319 by failing to report personal expenditures during the 2004 campaign, he filed this suit for a declaration that §319 is unconstitutional and an injunction preventing the FEC from enforcing the section during the 2006 election. The District Court concluded *sua sponte* that Davis had standing, but rejected his claims on the merits and granted the FEC summary judgment.

*Held:*

    1. This Court has jurisdiction to hear Davis' appeal. Pp. 6–10.

    (a) Davis has standing to challenge §319(b)'s disclosure requirements. When he filed suit, he had already declared his 2006 candidacy and had been forced by §319(b) to disclose to his opponent that he intended to spend more than $350,000 in personal funds. He also faced the imminent threat that he would have to follow up on that disclosure with further notifications once he passed the $350,000 mark. Securing a declaration that §319(b) is unconstitutional and an injunction against its enforcement would have spared him from making those disclosures and also would have removed the real threat that the FEC would pursue an enforcement action based on alleged §319(b) violations during his 2004 campaign. Davis also has standing to challenge §319(a)'s asymmetrical contribution limits. The standing inquiry focuses on whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed, see, *e.g., Friends of Earth, Inc.* v. *Laidlaw Environmental Services (TOC), Inc.*, 528 U. S. 167, 180, and a party facing prospective injury has standing where the threatened injury is real, immediate, and direct, see, *e.g., Los Angeles* v. *Lyons*, 461 U. S. 95, 102. Davis faced the requisite injury from §319(a) when he filed suit: He had already declared his candidacy and his intent to spend more than $350,000 of personal funds in the general election campaign whose onset was rapidly approaching. Section 319(a) would shortly burden his personal expenditure by allowing his opponent to receive contributions on more favorable terms, and there was no indication that his opponent would forgo that opportunity. Pp. 6–8.

    (b) The FEC's argument that the Court lacks jurisdiction because Davis' claims are moot also fails. In *Federal Election Comm'n* v. *Wisconsin Right to Life, Inc. (WRTL)*, 551 U. S. ___, this Court rejected a very similar claim of mootness, finding that the case "fit comfortably within the established exception to mootness for disputes capable of repetition, yet evading review." *Id.,* at ___. That "exception applies where '(1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration; and (2) there is a reasonable

expectation that the same complaining party will be subject to the same action again.'" *Ibid.* First, despite BCRA's command that the case be expedited to the greatest possible extent and Davis' request that his case be resolved before the 2006 election, the case could not be resolved before the 2006 election. See *id.,* at ___. Second, the FEC has conceded that Davis' §319(a) claim would be capable of repetition if he planned to self-finance another bid for a House seat, and he subsequently made a public statement expressing his intent to do so. See *id.,* at ___ . Pp. 8–9.

2. Sections 319(a) and (b) violate the First Amendment. If §319(a)'s elevated contribution limits applied across the board to all candidates, Davis would have no constitutional basis for challenging them. Section 319(a), however, raises the limits only for non-self-financing candidates and only when the self-financing candidate's expenditure of personal funds causes the OPFA threshold to be exceeded. This Court has never upheld the constitutionality of a law that imposes different contribution limits for candidates competing against each other, and it agrees with Davis that this scheme impermissibly burdens his First Amendment right to spend his own money for campaign speech. In *Buckley* v. *Valeo*, 424 U. S. 1, the Court soundly rejected a cap on a candidate's expenditure of personal funds to finance campaign speech, holding that a "candidate . . . has a First Amendment right to . . . vigorously and tirelessly . . . advocate his own election," and that a cap on personal expenditures imposes "a substantial," "clea[r,]" and "direc[t]" restraint on that right, *id.,* at 52–53. It found the cap at issue not justified by "[t]he primary governmental interest" in "the prevention of actual and apparent corruption of the political process," *id.,* at 53, or by "[t]he ancillary interest in equalizing the relative financial resources of candidates competing for elective office," *id.,* at 54. *Buckley* is instructive here. While BCRA does not impose a cap on a candidate's expenditure of personal funds, it imposes an unprecedented penalty on any candidate who robustly exercises that First Amendment right, requiring him to choose between the right to engage in unfettered political speech and subjection to discriminatory fundraising limitations. The resulting drag on First Amendment rights is not constitutional simply because it attaches as a consequence of a statutorily imposed choice. *Id.,* at 54–57, and n. 65, distinguished. The burden is not justified by any governmental interest in eliminating corruption or the perception of corruption, see *id.,* at 53. Nor can an interest in leveling electoral opportunities for candidates of different personal wealth justify §319(a)'s asymmetrical limits, see *id.,* at 56–57. The Court has never recognized this interest as a legitimate objective and doing so would have ominous implications for the voters' authority to evaluate the strengths of candidates

Syllabus

competing for office.  Finally, the Court rejects the Government's argument that §319(a) is justified because it ameliorates the deleterious effects resulting from the tight limits federal election law places on individual campaign contributions and coordinated party expenditures.  Whatever this argument's merits as an original matter, it is fundamentally at war with *Buckley*'s analysis of expenditure and contributions limits, which this Court has applied in subsequent cases.  Pp. 10–17.

(c) Because §319(a) is unconstitutional, §319(b)'s disclosure requirements, which were designed to implement the asymmetrical contribution limits, are as well.  "[C]ompelled disclosure, in itself, can seriously infringe on privacy of association and belief guaranteed by the First Amendment," *Buckley,* 424 U. S., at 64, so the Court closely scrutinizes such requirements, *id.,* at 75.  For significant encroachments to survive, there must be "a 'relevant correlation' or 'substantial relation' between the governmental interest and the information required to be disclosed" and the governmental interest must reflect the seriousness of the burden on First Amendment rights.  *Ibid.* Given §319(a)'s unconstitutionality, the burden imposed by the §319(b) requirements cannot be justified.  P. 18.

501 F. Supp. 2d 22, reversed and remanded.

ALITO, J., delivered the opinion of the Court, in which ROBERTS, C. J., and SCALIA, KENNEDY, and THOMAS, JJ., joined, and in which STEVENS, SOUTER, GINSBURG, and BREYER, JJ., joined as to Part II.  STEVENS, J., filed an opinion concurring in part and dissenting in part, in which SOUTER, GINSBURG, and BREYER, JJ., joined as to Part II.  GINSBURG, J., filed an opinion concurring in part and dissenting in part, in which BREYER, J., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

———————

No. 07–320

———————

## JACK DAVIS, APPELLANT *v.* FEDERAL ELECTION COMMISSION

### ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

[June 26, 2008]

JUSTICE ALITO delivered the opinion of the Court in which JUSTICE STEVENS, JUSTICE SOUTER, JUSTICE GINSBURG, and JUSTICE BREYER joined as to Part II.

In this appeal, we consider the constitutionality of federal election law provisions that, under certain circumstances, impose different campaign contribution limits on candidates competing for the same congressional seat.

I

A

Federal law limits the amount of money that a candidate for the House of Representatives and the candidate's authorized committee may receive from an individual, as well as the amount that the candidate's party may devote to coordinated campaign expenditures. 2 U. S. C. §441a (2006 ed.).[1] Under the usual circumstances, the same restrictions apply to all the competitors for a seat and their authorized committees. Contributions from individual donors during a 2-year election cycle are subject to a

———————

[1] All undesignated references in this opinion to 2 U. S. C. are to the 2006 edition.

cap, which is currently set at $2,300.  See §§441a(a)(1)(A),
(c); 72 Fed. Reg. 5295 (2007).  In addition, no funds may be
accepted from an individual whose aggregate contribu-
tions to candidates and their committees during the elec-
tion cycle have reached the legal limit, currently $42,700.
See 2 U. S. C. §§441a(a)(3)(A), (c); 72 Fed. Reg. 5295.  A
candidate also may not accept general election coordinated
expenditures by national or state political party committees
that exceed an imposed limit.  See 2 U. S. C. §§441a(c), (d).
Currently, the limit for candidates in States with more
than one House seat is $40,900.  72 Fed. Reg. 5294.[2]

  Section 319(a) of the Bipartisan Campaign Reform Act
of 2002 (BCRA), 116 Stat. 109, 2 U. S. C. §441a–1(a),[3] part
of the so-called "Millionaire's Amendment," fundamentally
alters this scheme when, as a result of a candidate's ex-
penditure of personal funds, the "opposition personal
funds amount" (OPFA) exceeds $350,000.[4]  The OPFA, in
simple terms, is a statistic that compares the expenditure
of personal funds by competing candidates and also takes
into account to some degree certain other fundraising.[5]
See §441a–1(a).  When a candidate's expenditure of per-
sonal funds causes the OPFA to pass the $350,000 mark

––––––––––

  [2] These limits are adjusted for inflation every two years.  2 U. S. C.
§441a(c).

  [3] BCRA §319(a) is set out in an Appendix to this opinion.  Although
what we refer to as §§319(a) and (b) are actually §315A(a) and (b) of the
Federal Election Campaign Act of 1971, which were added to that Act
by BCRA §319(a), we follow the convention of the parties in making
reference to §§319(a) and (b).

  [4] BCRA §304 similarly regulates self-financed Senate bids.  116 Stat.
97, 2 U. S. C. §441a(i).

  [5] The OPFA is calculated as follows.  For each candidate, expendi-
tures of personal funds are added to 50% of the funds raised for the
election at issue measured at designated dates in the year preceding
the election.  The resulting figures are compared, and if the difference
is greater than $350,000, the asymmetrical limits take effect.  See
§§441a–1(a)(1), (2).

(for convenience, such candidates will be referred to as "self-financing"), a new, asymmetrical regulatory scheme comes into play. The self-financing candidate remains subject to the limitations noted above, but the candidate's opponent (the "non-self-financing" candidate) may receive individual contributions at treble the normal limit *(e.g.,* $6,900 rather than the current $2,300), even from individuals who have reached the normal aggregate contributions cap, and may accept coordinated party expenditures without limit. See §§441a–1(a)(1)(A)–(C). Once the non-self-financing candidate's receipts exceed the OPFA, the prior limits are revived. §441a–1(a)(3). A candidate who does not spend the contributions received under the asymmetrical limits must return them. §441a–1(a)(4).

In order to calculate the OPFA, certain information is needed about the self-financing candidate's campaign assets and personal expenditures. Section 319(b) thus requires self-financing candidates to make three types of disclosures. First, within 15 days after entering a race, a candidate must file a "[d]eclaration of intent" revealing the amount of personal funds the candidate intends to spend in excess of $350,000. 2 U. S. C. §441a–1(b)(1)(B). A candidate who does not intend to cross this threshold may simply declare an intent to spend no personal funds. 11 CFR §400.20(a)(2) (2008). Second, within 24 hours of crossing or becoming obligated to cross the $350,000 mark, the candidate must file an "[i]nitial notification." 2 U. S. C. §441a–1(b)(1)(C). Third, the candidate must file an "[a]dditional notification" within 24 hours of making or becoming obligated to make each additional expenditure of $10,000 or more using personal funds. §441a–1(b)(1)(D). The initial and additional notifications must provide the date and amount of each expenditure from personal funds, and all notifications must be filed with the Federal Election Commission (FEC), all other candidates for the seat, and the national parties of all those candidates. §441a–

1(b)(1)(E). Failure to comply with the reporting require-
ments may result in civil and criminal penalties.
§§437g(a)(5)–(6), (d)(1).

A non-self-financing candidate and the candidate's
committee face less extensive disclosure requirements.
Within 24 hours after receiving an "initial" or "additional"
notification filed by a self-financing opponent, a non-self-
financing candidate must provide notice to the FEC and
the national and state committees of the candidate's party
if the non-self-financing candidate concludes based on the
newly acquired information that the OPFA has passed the
$350,000 mark. 11 CFR §400.30(b)(2). In addition, when
the additional contributions that a non-self-financing
candidate is authorized to receive pursuant to the asym-
metrical limitations scheme equals the OPFA, the non-
self-financing candidate must notify the FEC and the
appropriate national and state committees within 24
hours. §400.31(e)(1)(ii). The non-self-financing candidate
must also provide notice regarding any refunds of "excess
funds" (funds received under the increased limits but not
used in the campaign). §§400.50, 400.54. For their part,
political parties must notify the FEC and the candidate
they support within 24 hours of making any expenditures
that exceed the normal limit for coordinated party expen-
ditures. §400.30(c)(2).

B

Appellant Jack Davis was the Democratic candidate for
the House of Representatives from New York's 26th Con-
gressional District in 2004 and 2006. In both elections, he
lost to the incumbent. In his brief, Davis discloses having
spent $1.2 million, principally his own funds, on his 2004
campaign. Brief for Appellant 4. He reports spending
$2.3 million in 2006, all but $126,000 of which came from
personal funds. *Id.*, at 13. His opponent in 2006 spent no
personal funds. Indeed, although the OPFA calculation

provided the opportunity for Davis' opponent to raise nearly $1.5 million under §319(a)'s asymmetrical limits, Davis' opponent adhered to the normal contribution limits.

Davis' 2006 candidacy began in March 2006, when he filed with the FEC a "Statement of Candidacy" and, in compliance with §319(b), declared that he intended to spend $1 million in personal funds during the general election. Two months later, in anticipation of this expenditure and its §319 consequences, Davis filed suit against the FEC, requesting that §319 be declared unconstitutional and that the FEC be enjoined from enforcing it during the 2006 election.

After Davis declared his candidacy but before he filed suit, the FEC's general counsel notified him that it had reason to believe that he had violated §319 by failing to report personal expenditures during the 2004 campaign. The FEC proposed a conciliation agreement under which Davis would pay a substantial civil penalty. Davis responded by agreeing to toll the limitations period for an FEC enforcement action until resolution of this suit.

Davis filed this action in the United States District Court for the District of Columbia, and a three-judge panel was convened. BCRA §403, 116 Stat. 113, note following 2 U. S. C. §437h. While Davis requested that the case be decided before the general election campaign began on September 12, 2006, the FEC opposed the request, asserting the need for extensive discovery, and the request was denied. Ultimately, the parties filed cross-motions for summary judgment.

Ruling on those motions, the District Court began by addressing Davis' standing *sua sponte*. The Court concluded that Davis had standing, but rejected his claims on the merits and granted summary judgment for the FEC. 501 F. Supp. 2d 22 (2007). Davis then invoked BCRA's exclusive avenue for appellate review—direct appeal to this Court. Note following §437h. We deferred full con-

sideration of our jurisdiction, 552 U. S. ___ (2008), and we now reverse.

## II

Like the District Court, we must first ensure that we have jurisdiction to hear Davis' appeal. Article III restricts federal courts to the resolution of cases and controversies. *Arizonans for Official English* v. *Arizona*, 520 U. S. 43, 64 (1997). That restriction requires that the party invoking federal jurisdiction have standing—the "personal interest that must exist at the commencement of the litigation." *Friends of Earth, Inc.* v. *Laidlaw Environmental Services (TOC), Inc.*, 528 U. S. 167, 189 (2000) (internal quotation marks omitted). But it is not enough that the requisite interest exist at the outset. "To qualify as a case fit for federal-court adjudication, 'an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed.'" *Arizonans for Official English, supra,* at 67. The FEC argues that Davis' appeal fails to present a constitutional case or controversy because Davis lacks standing and because his claims are moot. We address each of these issues in turn.

## A

As noted, the requirement that a claimant have "standing is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan* v. *Defenders of Wildlife*, 504 U. S. 555, 560 (1992); see also *Arizonans for Official English, supra,* at 64. To qualify for standing, a claimant must present an injury that is concrete, particularized, and actual or imminent; fairly traceable to the defendant's challenged behavior; and likely to be redressed by a favorable ruling. *Lujan, supra,* at 560–561.

The District Court held, and the parties do not dispute, that Davis possesses standing to challenge the disclosure

requirements of §319(b). When Davis filed suit, he had already declared his 2006 candidacy and had been forced by §319(b) to disclose to his opponent that he intended to spend more than $350,000 in personal funds. At that time, Davis faced the imminent threat that he would have to follow up on that disclosure with further notifications after he in fact passed the $350,000 mark. Securing a declaration that §319(b)'s requirements are unconstitutional and an injunction against their enforcement would have spared him from making those disclosures. That relief also would have removed the real threat that the FEC would pursue an enforcement action based on alleged violations of §319(b) during his 2004 campaign. As a result, Davis possesses standing to challenge §319(b)'s disclosure requirement.

The fact that Davis has standing to challenge §319(b) does not necessarily mean that he also has standing to challenge the scheme of contribution limitations that applies when §319(a) comes into play. "[S]tanding is not dispensed in gross." *Lewis* v. *Casey*, 518 U. S. 343, 358, n. 6 (1996). Rather, "a plaintiff must demonstrate standing for each claim he seeks to press" and "'for each form of relief'" that is sought. *DaimlerChrysler Corp.* v. *Cuno*, 547 U. S. 332, 352 (2006) (quoting *Friends of Earth, supra,* at 185).

In light of these principles, the FEC argues that Davis lacks standing to attack §319(a)'s asymmetrical limits. When Davis commenced this action, his opponent had not yet qualified for the asymmetrical limits, and later, when his opponent did qualify to take advantage of those limits, he chose not to do so. Accordingly, the FEC argues that §319(a) did not cause Davis any injury.

While the proof required to establish standing increases as the suit proceeds, see *Lujan, supra,* at 561, the standing inquiry remains focused on whether the party invoking jurisdiction had the requisite stake in the outcome

when the suit was filed. *Friends of Earth*, *supra,* at 180; *Arizonans for Official English*, *supra,* at 68, n. 22. As noted above, the injury required for standing need not be actualized. A party facing prospective injury has standing to sue where the threatened injury is real, immediate, and direct. *Los Angeles* v. *Lyons*, 461 U. S. 95, 102 (1983); see also *Babbitt* v. *Farm Workers*, 442 U. S. 289, 298 (1979) (A plaintiff may challenge the prospective operation of a statute that presents a realistic and impending threat of direct injury). Davis faced such an injury from the operation of §319(a) when he filed suit. Davis had declared his candidacy and his intent to spend more than $350,000 of personal funds in the general election campaign whose onset was rapidly approaching. Section 319(a) would shortly burden his expenditure of personal funds by allowing his opponent to receive contributions on more favorable terms, and there was no indication that his opponent would forgo that opportunity. Indeed, the record at summary judgment indicated that most candidates who had the opportunity to receive expanded contributions had done so. App. 89. In these circumstances, we conclude that Davis faced the requisite injury from §319(a) when he filed suit and has standing to challenge that provision's asymmetrical contribution scheme.

B

The FEC's mootness argument also fails. This case closely resembles *Federal Election Comm'n* v. *Wisconsin Right to Life, Inc.*, 551 U. S. ___ (2007). There, Wisconsin Right to Life (WRTL), a nonprofit, ideological advocacy corporation, wished to run radio and TV ads within 30 days of the 2004 Washington primary, contrary to a restriction imposed by BCRA. WRTL sued the FEC, seeking declaratory and injunctive relief. Although the suit was not resolved before the 2004 election, we rejected the FEC's claim of mootness, finding that the case "fit com-

fortably within the established exception to mootness for disputes capable of repetition, yet evading review." *Id.,* at ___ (slip op., at 8). That "exception applies where '(1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration; and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again.'" *Ibid.* (quoting *Spencer* v. *Kemna,* 523 U. S. 1, 17 (1998)).

In *WRTL*, "despite BCRA's command that the cas[e] be expedited 'to the greatest possible extent,'" WRTL's claims could not reasonably be resolved before the election concluded. 551 U. S., at ___ (slip op., at 8) (quoting §403(a)(4), 116 Stat. 113, note following 2 U. S. C. §437h). Similarly, in this case despite BCRA's mandate to expedite and Davis' request that his case be resolved before the 2004 general election season commenced, Davis' case could not be resolved before the 2006 election concluded, demonstrating that his claims are capable of evading review.

As to the second prong of the exception, even though WRTL raised an as-applied challenge, we found its suit capable of repetition where "WRTL credibly claimed that it planned on running 'materially similar' future" ads subject to BCRA's prohibition and had, in fact, sought an injunction that would permit such an ad during the 2006 election. 551 U. S., at ___ (slip op., at 9) (some internal quotation marks omitted). Here, the FEC conceded in its brief that Davis' §319(a) claim would be capable of repetition if Davis planned to self-finance another bid for a House seat. Brief for Appellee 14, 20–21, and n. 5. Davis subsequently made a public statement expressing his intent to do so. See Reply Brief 16 (citing Terreri, Democrat Davis Confirms He'll Run Again for Congress, Rochester Democrat and Chronicle, Mar. 27, 2008, p. 5B). As a result, we are satisfied that Davis' facial challenge is not

moot.[6]

## III

We turn to the merits of Davis' claim that the First Amendment is violated by the contribution limits that apply when §319(a) comes into play. Under this scheme, as previously noted, when a candidate spends more than $350,000 in personal funds and creates what the statute apparently regards as a financial imbalance, that candidate's opponent may qualify to receive both larger individual contributions than would otherwise be allowed and unlimited coordinated party expenditures. Davis contends that §319(a) unconstitutionally burdens his exercise of his First Amendment right to make unlimited expenditures of his personal funds because making expenditures that create the imbalance has the effect of enabling his opponent to raise more money and to use that money to finance speech that counteracts and thus diminishes the effectiveness of Davis' own speech.

### A

If §319(a) simply raised the contribution limits for all candidates, Davis' argument would plainly fail. This Court has previously sustained the facial constitutionality of limits on discrete and aggregate individual contributions and on coordinated party expenditures. *Buckley* v. *Valeo*, 424 U. S. 1, 23–35, 38, 46–47, and n. 53 (1976) *(per curiam); Federal Election Comm'n* v. *Colorado Republican Federal Campaign Comm.*, 533 U. S. 431, 437, 465 (2001) *(Colorado II)*. At the same time, the Court has recognized that such limits implicate First Amendment interests and that they cannot stand unless they are "closely drawn" to serve a "sufficiently important interest," such as prevent-

--------------

[6] In light of this conclusion, we need not decide whether the threat of an FEC enforcement action for alleged 2004 violations would be sufficient to keep this controversy alive.

ing corruption and the appearance of corruption. See, *e.g., McConnell* v. *Federal Election Comm'n,* 540 U. S. 93, 136, 138, n. 40 (2003); *Colorado II, supra,* at 456; *Nixon* v. *Shrink Missouri Government PAC*, 528 U. S. 377, 387–388 (2000); *Buckley, supra,* at 25–30, 38. When contribution limits are challenged as too restrictive, we have extended a measure of deference to the judgment of the legislative body that enacted the law. See, *e.g., Randall* v. *Sorrell*, 548 U. S. 230, 248 (2006) (plurality opinion); *Nixon, supra,* at 396–397; *Buckley, supra,* at 30, 111, 103–104. But we have held that limits that are too low cannot stand. *Randall, supra,* at 246–262; *id.*, at 263 (ALITO, J., concurring in part and concurring in judgment).

There is, however, no constitutional basis for attacking contribution limits on the ground that they are too high. Congress has no constitutional obligation to limit contributions at all; and if Congress concludes that allowing contributions of a certain amount does not create an undue risk of corruption or the appearance of corruption, a candidate who wishes to restrict an opponent's fundraising cannot argue that the Constitution demands that contributions be regulated more strictly. Consequently, if §319(a)'s elevated contribution limits applied across the board, Davis would not have any basis for challenging those limits.

B

Section 319(a), however, does not raise the contribution limits across the board. Rather, it raises the limits only for the non-self-financing candidate and does so only when the self-financing candidate's expenditure of personal funds causes the OPFA threshold to be exceeded. We have never upheld the constitutionality of a law that imposes different contribution limits for candidates who are competing against each other, and we agree with Davis that this scheme impermissibly burdens his First Amendment

right to spend his own money for campaign speech.

In *Buckley*, we soundly rejected a cap on a candidate's expenditure of personal funds to finance campaign speech. We held that a "candidate . . . has a First Amendment right to engage in the discussion of public issues and vigorously and tirelessly to advocate his own election" and that a cap on personal expenditures imposes "a substantial," "clea[r]" and "direc[t]" restraint on that right. 424 U. S., at 52–53. We found that the cap at issue was not justified by "[t]he primary governmental interest" proffered in its defense, *i.e.*, "the prevention of actual and apparent corruption of the political process." *Id.,* at 53. Far from preventing these evils, "the use of personal funds," we observed, "reduces the candidate's dependence on outside contributions and thereby counteracts the coercive pressures and attendant risks of abuse to which . . . contribution limitations are directed." *Ibid.* We also rejected the argument that the expenditure cap could be justified on the ground that it served "[t]he ancillary interest in equalizing the relative financial resources of candidates competing for elective office." *Id.,* at 54. This putative interest, we noted, was "clearly not sufficient to justify the . . . infringement of fundamental First Amendment rights." *Ibid.*

*Buckley*'s emphasis on the fundamental nature of the right to spend personal funds for campaign speech is instructive. While BCRA does not impose a cap on a candidate's expenditure of personal funds, it imposes an unprecedented penalty on any candidate who robustly exercises that First Amendment right. Section 319(a) requires a candidate to choose between the First Amendment right to engage in unfettered political speech and subjection to discriminatory fundraising limitations. Many candidates who can afford to make large personal expenditures to support their campaigns may choose to do so despite §319(a), but they must shoulder a special and

potentially significant burden if they make that choice. See *Day* v. *Holahan*, 34 F. 3d 1356, 1359–1360 (CA8 1994) (concluding that a Minnesota law that increased a candidate's expenditure limits and eligibility for public funds based on independent expenditures against her candidacy burdened the speech of those making the independent expenditures); Brief for Appellee 29 (conceding that "[§]319 does impose some consequences on a candidate's choice to self-finance beyond certain amounts"). Under §319(a), the vigorous exercise of the right to use personal funds to finance campaign speech produces fundraising advantages for opponents in the competitive context of electoral politics. Cf. *Pacific Gas & Elec. Co.* v. *Public Util. Comm'n of Cal.*, 475 U. S. 1, 14 (1986) (plurality opinion) (finding infringement on speech rights where if the plaintiff spoke it could "be forced . . . to help disseminate hostile views").

The resulting drag on First Amendment rights is not constitutional simply because it attaches as a consequence of a statutorily imposed choice. In *Buckley*, we held that Congress "may engage in public financing of election campaigns and may condition acceptance of public funds on an agreement by the candidate to abide by specified expenditure limitations" even though we found an independent limit on overall campaign expenditures to be unconstitutional. 424 U. S., at 57, n. 65; see *id.,* at 54–58. But the choice involved in *Buckley* was quite different from the choice imposed by §319(a). In *Buckley,* a candidate, by forgoing public financing, could retain the unfettered right to make unlimited personal expenditures. Here, §319(a) does not provide any way in which a candidate can exercise that right without abridgment. Instead, a candidate who wishes to exercise that right has two choices: abide by a limit on personal expenditures or endure the burden that is placed on that right by the activation of a scheme of discriminatory contribution limits. The

choice imposed by §319(a) is not remotely parallel to that
in *Buckley*.

Because §319(a) imposes a substantial burden on the
exercise of the First Amendment right to use personal
funds for campaign speech, that provision cannot stand
unless it is "justified by a compelling state interest," *Fed-
eral Election Comm'n* v. *Massachusetts Citizens for Life,
Inc.*, 479 U. S. 238, 256 (1986); see also, *e.g.*, *McConnell,*
540 U. S., at 205; *Austin* v. *Michigan Chamber of Com-
merce*, 494 U. S. 652, 657–658 (1990); *id.,* at 680 (SCALIA,
J., dissenting); *id.,* at 701, 702–703 (KENNEDY, J., dissent-
ing); *Federal Election Comm'n* v. *National Conservative
Political Action Comm.*, 470 U. S. 480, 500–501 (1985);
*First Nat. Bank of Boston* v. *Bellotti*, 435 U. S. 765, 786
(1978); *Colorado Republican Federal Campaign Comm.* v.
*Federal Election Comm'n*, 518 U. S. 604, 609 (1996) (prin-
cipal opinion) *(Colorado I); id.,* at 640–641 (THOMAS, J.,
concurring in judgment and dissenting in part).  No such
justification is present here.[7]

The burden imposed by §319(a) on the expenditure of
personal funds is not justified by any governmental inter-
est in eliminating corruption or the perception of corrup-
tion.  The *Buckley* Court reasoned that reliance on per-
sonal funds *reduces* the threat of corruption, and therefore
§319(a), by discouraging use of personal funds, disserves
the anticorruption interest.  Similarly, given Congress'
judgment that liberalized limits for non-self-financing

_____

[7] Even if §319(a) were characterized as a limit on contributions rather
than expenditures, it is doubtful whether it would survive.  A contribu-
tion limit involving " ' "significant interference" with associational
rights' " must be " ' "closely drawn" ' " to serve a " ' "sufficiently impor-
tant interest." ' "  *McConnell* v. *Federal Election Comm'n*, 540 U. S. 93,
136 (2003).  For the reasons explained *infra,* at 15–16, the chief interest
proffered in support of the asymmetrical contribution scheme—leveling
electoral opportunities—cannot justify the infringement of First
Amendment interests.

candidates do not unduly imperil anticorruption interests, it is hard to imagine how the denial of liberalized limits to self-financing candidates can be regarded as serving anticorruption goals sufficiently to justify the resulting constitutional burden.

The Government maintains that §319(a)'s asymmetrical limits are justified because they "level electoral opportunities for candidates of different personal wealth." Brief for Appellee 34. "Congress enacted Section 319," the Government writes," "to reduce *the natural advantage* that wealthy individuals possess in campaigns for federal office." *Id.,* at 33 (emphasis added). Our prior decisions, however, provide no support for the proposition that this is a legitimate government objective. See *Nixon,* 528 U. S., at 428 (THOMAS, J., dissenting) ("'[P]reventing corruption or the appearance of corruption are the only legitimate and compelling government interests thus far identified for restricting campaign finances'" (quoting *National Conservative Political Action Comm.*, *supra*, at 496–497)); *Randall,* 548 U. S., at 268 (THOMAS, J., concurring in judgment) (noting "the interests the Court has recognized as compelling, *i.e.*, the prevention of corruption or the appearance thereof"). On the contrary, in *Buckley,* we held that "[t]he interest in equalizing the financial resources of candidates" did not provide a "justification for restricting" candidates' overall campaign expenditures, particularly where equalization "might serve . . . to handicap a candidate who lacked substantial name recognition or exposure of his views before the start of the campaign." 424 U. S., at 56–57. We have similarly held that the interest "in equalizing the relative ability of individuals and groups to influence the outcome of elections" cannot support a cap on expenditures for "express advocacy of the election or defeat of candidates," as "the concept that government may restrict the speech of some elements of our society in order to enhance the relative voice of others

is wholly foreign to the First Amendment." *Id.,* at 48–49; see also *McConnell, supra,* at 227 (noting, in assessing standing, that there is no legal right to have the same resources to influence the electoral process). Cf. *Austin, supra,* at 705 (KENNEDY, J., dissenting) (rejecting as "antithetical to the First Amendment" "the notion that the government has a legitimate interest in restricting the quantity of speech to equalize the relative influence of speakers on elections").

The argument that a candidate's speech may be restricted in order to "level electoral opportunities" has ominous implications because it would permit Congress to arrogate the voters' authority to evaluate the strengths of candidates competing for office. See *Bellotti, supra,* at 791–792 ("[T]he people in our democracy are entrusted with the responsibility for judging and evaluating the relative merits of conflicting arguments" and "may consider, in making their judgment, the source and credibility of the advocate"). Different candidates have different strengths. Some are wealthy; others have wealthy supporters who are willing to make large contributions. Some are celebrities; some have the benefit of a well-known family name. Leveling electoral opportunities means making and implementing judgments about which strengths should be permitted to contribute to the outcome of an election. The Constitution, however, confers upon voters, not Congress, the power to choose the Members of the House of Representatives, Art. I, §2, and it is a dangerous business for Congress to use the election laws to influence the voters' choices. See *Bellotti*, 435 U. S., at 791, n. 31 (The "[g]overnment is forbidden to assume the task of ultimate judgment, lest the people lose their ability to govern themselves").

Finally, the Government contends that §319(a) is justified because it ameliorates the deleterious effects that result from the tight limits that federal election law places

on individual campaign contributions and coordinated party expenditures. These limits, it is argued, make it harder for candidates who are not wealthy to raise funds and therefore provide a substantial advantage for wealthy candidates. Accordingly, §319(a) can be seen, not as a legislative effort to interfere with the natural operation of the electoral process, but as a legislative effort to mitigate the untoward consequences of Congress' own handiwork and restore "the normal relationship between a candidate's financial resources and the level of popular support for his candidacy." Brief for Appellee 33.

Whatever the merits of this argument as an original matter, it is fundamentally at war with the analysis of expenditure and contributions limits that this Court adopted in *Buckley* and has applied in subsequent cases. The advantage that wealthy candidates now enjoy and that §319(a) seeks to reduce is an advantage that flows directly from *Buckley*'s disparate treatment of expenditures and contributions. If that approach is sound—and the Government does not urge us to hold otherwise[8]—it is hard to see how undoing the consequences of that decision can be viewed as a compelling interest. If the normally applicable limits on individual contributions and coordinated party contributions are seriously distorting the electoral process, if they are feeding a "public perception that wealthy people can buy seats in Congress," Brief for Appellee 34, and if those limits are not needed in order to

---

[8] JUSTICE STEVENS would revisit and reject *Buckley*'s treatment of expenditure limits. *Post*, at 2–4 (opinion concurring in part and dissenting in part). The Government has not urged us to take that step, and in any event, JUSTICE STEVENS' proposal is unsound. He suggests that restricting the quantity of campaign speech would improve the quality of that speech, but it would be dangerous for the Government to regulate core political speech for the asserted purpose of improving that speech. And in any event, there is no reason to suppose that restricting the quantity of campaign speech would have the desired effect.

combat corruption, then the obvious remedy is to raise or eliminate those limits. But the unprecedented step of imposing different contribution and coordinated party expenditure limits on candidates vying for the same seat is antithetical to the First Amendment.

## IV

The remaining issue that we must consider is the constitutionality of §319(b)'s disclosure requirements. "[W]e have repeatedly found that compelled disclosure, in itself, can seriously infringe on privacy of association and belief guaranteed by the First Amendment." *Buckley*, 424 U. S., at 64. As a result, we have closely scrutinized disclosure requirements, including requirements governing independent expenditures made to further individuals' political speech. *Id.,* at 75. To survive this scrutiny, significant encroachments "cannot be justified by a mere showing of some legitimate governmental interest." *Id.*, at 64. Instead, there must be "a 'relevant correlation' or 'substantial relation' between the governmental interest and the information required to be disclosed," and the governmental interest "must survive exacting scrutiny." *Ibid.* (footnotes omitted). That is, the strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights. *Id.,* at 68, 71.

The §319(b) disclosure requirements were designed to implement the asymmetrical contribution limits provided for in §319(a), and as discussed above, §319(a) violates the First Amendment. In light of that holding, the burden imposed by the §319(b) requirements cannot be justified, and it follows that they too are unconstitutional.[9]

---

[9] Because we conclude that §§319(a) and (b) violate the First Amendment, we need not address Davis' claim that they also violate the equal protection component of the Fifth Amendment's Due Process Clause.

Opinion of the Court

\*     \*     \*

In sum, we hold that §§319(a) and (b) violate the First Amendment. The judgment of the District Court is reversed, and the case is remanded for proceedings consistent with this opinion.

*It is so ordered.*

APPENDIX

BCRA §319(a) provides:
"(a) Availability of increased limit
  "(1) In general
  "Subject to paragraph (3), if the opposition personal funds amount with respect to a candidate for election to the office of Representative in, or Delegate or Resident Commissioner to, the Congress exceeds $350,000—
  "(A) the limit under subsection (a)(1)(A) with respect to the candidate shall be tripled;
  "(B) the limit under subsection (a)(3) shall not apply with respect to any contribution made with respect to the candidate if the contribution is made under the increased limit allowed under subparagraph (A) during a period in which the candidate may accept such a contribution; and
  "(C) the limits under subsection (d) with respect to any expenditure by a State or national committee of a political party on behalf of the candidate shall not apply.
  "(2) Determination of opposition personal funds amount
  "(A) In general
  "The opposition personal funds amount is an amount equal to the excess (if any) of—
  "(i) the greatest aggregate amount of expenditures from personal funds (as defined in subsection (b)(1) of this section) that an opposing candidate in the same election makes; over
  "(ii) the aggregate amount of expenditures from personal funds made by the candidate with respect to the election.
  "(B) Special rule for candidate's campaign funds
  "(i) In general
  "For purposes of determining the aggregate amount of expenditures from personal funds under subparagraph (A), such amount shall include the gross receipts advantage of the candidate's authorized committee.

Appendix to opinion of the Court

"(ii) Gross receipts advantage

"For purposes of clause (i), the term "gross receipts advantage" means the excess, if any, of—

"(I) the aggregate amount of 50 percent of gross receipts of a candidate's authorized committee during any election cycle (not including contributions from personal funds of the candidate) that may be expended in connection with the election, as determined on June 30 and December 31 of the year preceding the year in which a general election is held, over

"(II) the aggregate amount of 50 percent of gross receipts of the opposing candidate's authorized committee during any election cycle (not including contributions from personal funds of the candidate) that may be expended in connection with the election, as determined on June 30 and December 31 of the year preceding the year in which a general election is held.

"(3) Time to accept contributions under increased limit

"(A) In general

"Subject to subparagraph (B), a candidate and the candidate's authorized committee shall not accept any contribution, and a party committee shall not make any expenditure, under the increased limit under paragraph (1)—

"(i) until the candidate has received notification of the opposition personal funds amount under subsection (b)(1) of this section; and

"(ii) to the extent that such contribution, when added to the aggregate amount of contributions previously accepted and party expenditures previously made under the increased limits under this subsection for the election cycle, exceeds 100 percent of the opposition personal funds amount.

"(B) Effect of withdrawal of an opposing candidate

"A candidate and a candidate's authorized committee shall not accept any contribution and a party shall not make any expenditure under the increased limit after the

date on which an opposing candidate ceases to be a candidate to the extent that the amount of such increased limit is attributable to such an opposing candidate.

"(4) Disposal of excess contributions

"(A) In general

"The aggregate amount of contributions accepted by a candidate or a candidate's authorized committee under the increased limit under paragraph (1) and not otherwise expended in connection with the election with respect to which such contributions relate shall, not later than 50 days after the date of such election, be used in the manner described in subparagraph (B).

"(B) Return to contributors

"A candidate or a candidate's authorized committee shall return the excess contribution to the person who made the contribution."

"(b) Notification of expenditures from personal funds

"(1) In general

"(A) Definition of expenditure from personal funds

In this paragraph, the term "expenditure from personal funds" means—

"(i) an expenditure made by a candidate using personal funds; and

"(ii) a contribution or loan made by a candidate using personal funds or a loan secured using such funds to the candidate's authorized committee.

"(B) Declaration of intent

"Not later than the date that is 15 days after the date on which an individual becomes a candidate for the office of Representative in, or Delegate or Resident Commissioner to, the Congress, the candidate shall file a declaration stating the total amount of expenditures from personal funds that the candidate intends to make, or to obligate to make, with respect to the election that will exceed $350,000.

"(C) Initial notification

Appendix to opinion of the Court

"Not later than 24 hours after a candidate described in subparagraph (B) makes or obligates to make an aggregate amount of expenditures from personal funds in excess of $350,000 in connection with any election, the candidate shall file a notification.

"(D) Additional notification

"After a candidate files an initial notification under subparagraph (C), the candidate shall file an additional notification each time expenditures from personal funds are made or obligated to be made in an aggregate amount that exceeds $10,000. Such notification shall be filed not later than 24 hours after the expenditure is made.

"(E) Contents

"A notification under subparagraph (C) or (D) shall include—

"(i) the name of the candidate and the office sought by the candidate;

"(ii) the date and amount of each expenditure; and

"(iii) the total amount of expenditures from personal funds that the candidate has made, or obligated to make, with respect to an election as of the date of the expenditure that is the subject of the notification.

"(F) Place of filing

"Each declaration or notification required to be filed by a candidate under subparagraph (C), (D), or (E) shall be filed with—

"(i) the Commission; and

"(ii) each candidate in the same election and the national party of each such candidate.

"(2) Notification of disposal of excess contributions

"In the next regularly scheduled report after the date of the election for which a candidate seeks nomination for election to, or election to, Federal office, the candidate or the candidate's authorized committee shall submit to the Commission a report indicating the source and amount of any excess contributions (as determined under subsection

(a) of this section) and the manner in which the candidate or the candidate's authorized committee used such funds.

"(3) Enforcement

"For provisions providing for the enforcement of the reporting requirements under this subsection, see section 437g of this title."  2 U. S. C. §441a–1 (footnotes omitted).

# SUPREME COURT OF THE UNITED STATES

———————

No. 07–320

———————

## JACK DAVIS, APPELLANT *v.* FEDERAL ELECTION COMMISSION

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

[June 26, 2008]

JUSTICE STEVENS, with whom JUSTICE SOUTER, JUSTICE GINSBURG, and JUSTICE BREYER join as to Part II, concurring in part and dissenting in part.

The "Millionaire's Amendment" of the Bipartisan Campaign Reform Act of 2002 (BCRA), 116 Stat. 109, 2 U. S. C. §441a–1 (2006 ed.), is the product of a congressional judgment that candidates who are willing and able to spend over $350,000 of their own money in seeking election to Congress enjoy an advantage over opponents who must rely on contributions to finance their campaigns. To reduce that advantage, and to combat the perception that congressional seats are for sale to the highest bidder, Congress has relaxed the restrictions that would otherwise limit the amount of contributions that the opponents of self-funding candidates may accept from their supporters. In a thorough and well-reasoned opinion, the District Court held that because the Millionaire's Amendment does not impose any burden whatsoever on the self-funding candidate's freedom to speak, it does not violate the First Amendment, and because it does no more than diminish the unequal strength of the self-funding candidate, it does not violate the equal protection component of the Fifth Amendment. I agree completely with the District Court's opinion, specifically its adherence to our decision in *McConnell* v. *Federal Election Comm'n*, 540 U. S. 93

(2003).  While I would affirm for the reasons given by the District Court, I believe it appropriate to add these additional comments on the premise that underlies the constitutional prohibition on expenditure limitations, and on my reasons for concluding that the Millionaire's Amendment represents a modest, sensible, and plainly constitutional attempt by Congress to minimize the advantages enjoyed by wealthy candidates vis-à-vis those who must rely on the support of others to fund their pursuit of public office.

I

According to the Court's decision in *Buckley* v. *Valeo*, 424 U. S. 1, 18 (1976) (*per curiam)*, the vice that condemns expenditure limitations is that they "impose direct quantity restrictions" on political speech.[1]  A limitation on the amount of money that a candidate is permitted to spend, the *Buckley* Court concluded, "reduces the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached."  *Id.,* at 19.  Accordingly, the Court determined that any regulation of the quantity of money spent on campaigns for office ought to be viewed as a direct regulation of speech itself.

Justice White firmly disagreed with the *Buckley* Court's holding on expenditure limitations, explaining that such regulations should be analyzed, not as direct restrictions on speech, but rather as akin to time, place, and manner regulations, which will be upheld "so long as the purposes they serve are legitimate and sufficiently substantial." *Id.,* at 264 (opinion concurring in part and dissenting in

─────────────

[1] The *Buckley* Court invalidated two different types of limits on campaign expenditures: limits on the amount of "personal or family resources" a candidate could spend on his own campaign, 424 U. S., at 51–54, and overall limits on campaign expenditures, *id.,* at 54–60.  In my judgment the Court was mistaken in striking down both of those provisions; I treat them together here.

part). Although I did not participate in the Court's decision in *Buckley,* I have since been persuaded that Justice White—who maintained his steadfast opposition to *Buckley*'s view of expenditure limits, see, *e.g., Federal Election Comm'n* v. *National Conservative Political Action Comm.*, 470 U. S. 480, 507–512 (1985) (dissenting opinion)—was correct. Indeed, it was *Buckley* that represented a break from 65 years of established practice, as well as a probable departure from the views of the Framers of the relevant provisions of the Constitution itself. See *Randall* v. *Sorrell*, 548 U. S. 230, 274, 280–281 (STEVENS, J., dissenting).

In my view, a number of purposes, both legitimate and substantial, may justify the imposition of reasonable limitations on the expenditures permitted during the course of any single campaign. For one, such limitations would "free candidates and their staffs from the interminable burden of fundraising." *Colorado Republican Federal Campaign Comm.* v. *Federal Election Comm'n*, 518 U. S. 604, 649 (1996) (STEVENS, J., dissenting). Moreover, the imposition of reasonable limitations would likely have the salutary effect of improving the quality of the exposition of ideas. After all, orderly debate is always more enlightening than a shouting match that awards points on the basis of decibels rather than reasons. Quantity limitations are commonplace in any number of other contexts in which high-value speech occurs. Litigants in this Court pressing issues of the utmost importance to the Nation are allowed only a fixed time for oral debate and a maximum number of pages for written argument. As listeners and as readers, judges need time to reflect on the merits of an issue; repetitious arguments are disfavored and are usually especially unpersuasive. Indeed, experts in the art of advocacy agree that "lawyers go on for too long, and when

they do it doesn't help their case."[2]  It seems to me that Congress is entitled to make the judgment that voters deserve the same courtesy and the same opportunity to reflect as judges; flooding the airwaves with slogans and sound-bites may well do more to obscure the issues than to enlighten listeners.  At least in the context of elections, the notion that rules limiting the quantity of speech are just as offensive to the First Amendment as rules limiting the content of speech is plainly incorrect.[3]

If, as I have come to believe, Congress could attempt to reduce the millionaire candidate's advantage by imposing reasonable limits on *all* candidates' expenditures, it follows *a fortiori* that the eminently reasonable scheme before us today survives constitutional scrutiny.

## II

Even accepting the *Buckley* Court's holding that expenditure limits as such are uniquely incompatible with the First Amendment, it remains my firm conviction that the Millionaire's Amendment represents a good-faith attempt by Congress to regulate, within the bounds of the Constitution, one particularly pernicious feature of many contemporary political campaigns.[4]

————————

[2] Brust, A Voice for the Write: Tips on Making Your Case From a Supremely Reliable Source, 94 A. B. A. J. 37 (May 2008) (interview with JUSTICE SCALIA and Bryan Garner).

[3] The Court is of course correct that "it would be dangerous for the Government to regulate core political speech for the asserted purpose of improving that speech." *Ante,* at 17, n. 8.  But campaign expenditures are not *themselves* "core political speech"; they merely may *enable* such speech (as well as its repetition *ad nauseam*).  In my judgment, it is simply not the case that the First Amendment "provides the same measure of protection" to the use of money to enable speech as it does to speech itself.  *Nixon* v. *Shrink Missouri Government PAC*, 528 U. S. 377, 398 (2000) (STEVENS, J., concurring).

[4] I note at the outset of this discussion, however, that I agree with the Court's conclusion that Davis has standing to challenge §§319(a) and (b), and that the case is not moot; I therefore join Part II of the Court's

It cannot be gainsaid that the twin rationales at the heart of the Millionaire's Amendment—reducing the importance of wealth as a criterion for public office and countering the perception that seats in the United States Congress are available for purchase by the wealthiest bidder—are important Government interests. It is also evident that Congress, in enacting the provision, crafted a solution that was carefully tailored to those concerns. Davis insists, however, that the Government's interests are insufficiently weighty to justify what he believes are intrusions upon his rights under the First Amendment and the equal protection component of the Fifth Amendment, and that, regardless of the strength of the justifications offered, Congress' solution is not sufficiently tailored to addressing the twin concerns it has identified. His arguments are unpersuasive on all counts.

A

The thrust of Davis' First Amendment challenge is that by relaxing the contribution limits applicable to the opponent of a self-funding candidate, the Millionaire's Amendment punishes the candidate who chooses to self-fund. Extrapolating from the zero-sum nature of a political race, Davis insists that any benefit conferred upon a self-funder's opponent thereby works a detriment to the self-funding candidate. Accordingly, he argues, the scheme burdens the self-funding candidate's First Amendment right to speak freely and to participate fully in the political process.

But Davis cannot show that the Millionaire's Amendment causes him—or any other self-funding candidate— any First Amendment injury whatsoever. The Millionaire's Amendment quiets no speech at all. On the contrary, it does no more than assist the opponent of a self-

———————

opinion.

funding candidate in his attempts to make his voice heard; this amplification in no way mutes the voice of the millionaire, who remains able to speak as loud and as long as he likes in support of his campaign. Enhancing the speech of the millionaire's opponent, far from contravening the First Amendment, actually advances its core principles. If only one candidate can make himself heard, the voter's ability to make an informed choice is impaired.[5] And the self-funding candidate's ability to engage meaningfully in the political process is in no way undermined by this provision.[6]

Even were we to credit Davis' view that the benefit conferred on the self-funding candidate's opponent burdens the self-funder's First Amendment rights, the purposes of the Amendment surely justify its effects. The Court is simply wrong when it suggests that the "governmental interest in eliminating corruption or the perception of corruption," *ante,* at 14, is the sole governmental interest sufficient to support campaign finance regulations. See *ante,* at 15–17. It is true, of course, that in upholding the Federal Election Campaign Act of 1971's (FECA) limits on the size of contributions to political campaigns, the *Buckley* Court held that preventing both actual corruption and the appearance of corruption were Government interests of sufficient weight that they justified any infringement upon First Amendment freedoms that re-

---

[5] "In a republic where the people are sovereign, the ability of the citizenry to make informed choices among candidates for office is essential, for the identities of those who are elected will inevitably shape the course that we follow as a nation." *Buckley* v. *Valeo,* 424 U. S. 1, 14–15 (1976) *(per curiam).*

[6] The self-funder retains the choice to structure his campaign's funding as he pleases: He may choose to fund his own campaign subject to no limitations whatsoever and still accept limited donations from supporters; alternatively, he may forgo self-financing and rely on contributions alone, at the same level as his opponent. In neither event is his engagement in the political process in any sense impeded.

sulted from FECA's contribution limits; the Court explained that, "[t]o the extent that large contributions are given to secure a political *quid pro quo* from current and potential office holders, the integrity of our system of representative democracy is undermined. . . . Of almost equal concern . . . is the impact of the appearance of corruption stemming from public awareness of the opportunities for abuse inherent in a regime of large individual financial contributions." 424 U. S., at 26–27. It is also true that the Court found that same interest insufficient to justify FECA's expenditure limitations. *Id.,* at 45–46, 52–56. But it does not follow that the *Buckley* Court concluded that *only* the interest in combating corruption and the appearance of corruption can justify congressional regulation of campaign financing.

Indeed, we have long recognized the strength of an independent governmental interest in reducing both the influence of wealth on the outcomes of elections, and the appearance that wealth alone dictates those results. In case after case, we have held that statutes designed to protect against the undue influence of aggregations of wealth on the political process—where such statutes are responsive to the identified evil—do not contravene the First Amendment. See, *e.g., Austin* v. *Michigan Chamber of Commerce,* 494 U. S. 652, 660 (1990) (upholding statute designed to combat "the corrosive and distorting effects of immense aggregations of wealth that are accumulated with the help of the corporate form and that have little or no correlation to the public's support for the corporation's political ideas"); *Federal Election Comm'n* v. *Massachusetts Citizens for Life, Inc.*, 479 U. S. 238, 257 (1986) ("Th[e] concern over the corrosive influence of concentrated corporate wealth reflects the conviction that it is important to protect the integrity of the marketplace of political ideas. . . . Direct corporate spending on political activity raises the prospect that resources amassed in the

economic marketplace may be used to provide an unfair advantage in the political marketplace"); cf. *Red Lion Broadcasting Co.* v. *FCC*, 395 U. S. 367, 390 (1969) (upholding constitutionality of several components of the FCC's "fair coverage" requirements, and explaining that "[i]t is the purpose of the First Amendment to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail, rather than to countenance monopolization of that market").

Although the focus of our cases has been on aggregations of corporate rather than individual wealth, there is no reason that their logic—specifically, their concerns about the corrosive and distorting effects of wealth on our political process—is not equally applicable in the context of individual wealth. For, as we explained in *McConnell*, "Congress' historical concern with the 'political potentialities of wealth' and their 'untoward consequences for the democratic process'. . . has long reached beyond corporate money," 540 U. S., at 116 (quoting *United States* v. *Automobile Workers*, 352 U. S. 567, 577–578 (1957)).

Minimizing the effect of concentrated wealth on our political process, and the concomitant interest in addressing the dangers that attend the perception that political power can be purchased, are, therefore, sufficiently weighty objectives to justify significant congressional action. And, not only was Congress motivated by proper and weighty goals in crafting the Millionaire's Amendment, the details of the scheme it devised are genuinely responsive to the problems it identified. The statute's "Opposition Personal Funds Amount" formula permits a self-funding candidate to spend as much money as he wishes, while taking into account fundraising by the relevant campaigns; it thereby ensures that a candidate who happens to enjoy a significant fundraising advantage against a self-funding opponent does not reap a windfall as a result of the enhanced contribution limits. Rather,

the self-funder's opponent may avail himself of the enhanced contribution limits only until parity is achieved, at which point he becomes again ineligible for contributions above the normal maximum. See §§441a–1(a)(1)(A)–(C).

It seems uncontroversial that "there is no good reason to allow disparities in wealth to be translated into disparities in political power. A well-functioning democracy distinguishes between market processes of purchase and sale on the one hand and political processes of voting and reason-giving on the other." Sunstein, Political Equality and Unintended Consequences, 94 Colum. L. Rev. 1390 (1994). In light of that clear truth, Congress' carefully crafted attempt to reduce the distinct advantages enjoyed by wealthy candidates for congressional office does not offend the First Amendment.

## B

Davis' equal protection argument, which the Court finds unnecessary to address, *ante,* at 18, n. 9, fares no better. He claims that by permitting only the self-funder's opponent to avail himself of the increased contribution limits, the statute creates an unwarranted disparity between the self-funder and his opponent. But, as we explained in *McConnell,* "Congress is fully entitled to consider . . . real-world differences . . . when crafting a system of campaign finance regulation." 540 U. S., at 188. And *Buckley* itself acknowledged, in the course of upholding FECA's public financing scheme, that "the Constitution does not require Congress to treat all declared candidates the same." 424 U. S., at 97. It blinks reality to contend that the millionaire candidate is situated identically to a nonmillionaire opponent, and Congress was under no obligation to indulge any such fiction. Accordingly, Davis has failed to establish that he was deprived of the equal protection guarantees of the Fifth Amendment.

### III

In sum, I share Judge Wright's view that nothing in the Constitution "prevents us, as a political community, from making certain modest but important changes in the kind of process we want for selecting our political leaders," Wright, Politics and the Constitution: Is Money Speech? 85 Yale L. J. 1001, 1005 (1976).  In my judgment, the Millionaire's Amendment represents just such a change.  I therefore respectfully dissent.

# SUPREME COURT OF THE UNITED STATES

No. 07–320

JACK DAVIS, APPELLANT *v.* FEDERAL
ELECTION COMMISSION

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA

[June 26, 2008]

JUSTICE GINSBURG, with whom JUSTICE BREYER joins, concurring in part and dissenting in part.

Agreeing with the Court that appellant Jack Davis has standing and that this case is not moot, I join Part II of the Court's opinion. On the merits, however, I part ways with the Court. The District Court's careful and persuasive opinion, as I see it, correctly concluded that the provisions challenged in this case are entirely consistent with *Buckley* v. *Valeo*, 424 U. S. 1 (1976) *(per curiam)*, and all other relevant decisions of this Court. I therefore join Part II of JUSTICE STEVENS' opinion.

I resist joining other portions of JUSTICE STEVENS' opinion, however, to the extent that they address *Buckley*'s distinction between expenditure and contribution limits and, correspondingly, *Buckley*'s holding that expenditure limits impose "direct quantity restrictions on political communication," *id.*, at 18. Appellee Federal Election Commission has not asked us to overrule *Buckley*; consequently, the issue has not been briefed. Convinced that the challenged statute encounters no constitutional shoal under our precedents, I would leave reconsideration of *Buckley* for a later day and case.